**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

**J.K., *et al.*,**

***Plaintiffs*,**

**v.**

**DR. MARK T. BEDELL, *et al.*,**

***Defendants*.**

**Civil No.: 1:25-cv-00483-JRR**

**MEMORANDUM OPINION**

Pending before the court are the parties' cross motions for summary judgment: Plaintiffs' Motion for Summary Judgment (ECF No. 25; "Plaintiffs' Motion") and Defendants' Cross Motion for Summary Judgment (ECF No. 26; "Defendants' Motion"). Plaintiffs are minor child J.K., by and through his parent, L.K. Defendants are Dr. Mark T. Bedell as Superintendent of Schools, and the Anne Arundel County Board of Education (the "Board"), which operates Anne Arundel County Public Schools ("AACPS" or the "school district"). The court has reviewed all papers; no hearing is necessary. Local Rule 105.6 (D. Md. 2025). For the reasons that follow, by accompanying order, Plaintiffs' Motion will be denied, and Defendants' Motion will be granted.

## I. BACKGROUND[1]

J.K., around 15 years old, is a resident of Anne Arundel County who has been diagnosed with a moderate intellectual disability ("ID") and seizure disorder. (ECF No. 25-1 at pp. 2, 4; ECF No. 26-1 at p. 2; AHD ¶ 1.) J.K. receives special education services for multiple disabilities, including his ID and other health impairments, and was found eligible for special education

[1] For the reasons discussed more fully below, the court affords due weight to the Administrative Law Judge's ("ALJ") factual findings and credibility determinations from the underlying administrative hearing and considers them *prima facie* correct. *See G.M. by E.P. v. Barnes*, 114 F.4th 323, 334 (4th Cir. 2024). The facts here thus largely mirror those in the ALJ's Administrative Hearing Decision ("AHD").

services in November 2013. (AHD ¶¶ 2, 4.) His diagnosis was later changed to specific learning disability in May 2016, resulting in an update to his Individualized Education Program ("IEP") services as described below. *Id.* ¶ 5.

**A. Statutory Framework—Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §§ 1400, *et seq.***

"The IDEA offers federal funds to States in exchange for a commitment: to furnish a 'free appropriate public education'—more concisely known as a FAPE—to all children with certain physical or intellectual disabilities." *Fry v. Napoleon Cmty. Sch.*, 580 U.S. 154, 158 (2017). FAPE refers to:

> [S]pecial education and related services that—
> (A) have been provided at public expense, under public supervision and direction, and without charge;
> (B) meet the standards of the State educational agency;
> (C) include an appropriate preschool, elementary school, or secondary school education in the State involved; and
> (D) are provided in conformity with the individualized education program required under [20 U.S.C. § 1414(d)].

20 U.S.C. § 1401(9). Where the State accepts IDEA financial assistance, "[a]n eligible child . . . acquires a 'substantive right' to such an education." *Fry*, 580 U.S. at 158.

The "primary vehicle" for providing a FAPE to an eligible child is through an IEP. *Honig v. Doe*, 484 U.S. 305, 311 (1988); *see Fry*, 580 U.S. at 158 (acknowledging same). "The IEP is 'the centerpiece of the [IDEA's] education delivery system for disabled children.'" *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 391 (2017) (quoting *Honig*, 484 U.S. at 311). Stated simply, an IEP is "a document that describes the child's unique needs and the state's plan for meeting those needs." *R.F. by & through E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 241 (4th Cir. 2019). An IEP refers to "a written statement for each child with a disability that is developed, reviewed, and revised in accordance with [20 U.S.C. § 1414(d)]." 20 U.S.C. §

1401(14). It is a "comprehensive plan prepared by a child's 'IEP Team,'" composed of the child's parents, teachers, and school officials. *Endrew*, 580 U.S. at 391; 20 U.S.C. § 1414(d)(1)(B). An IEP includes a host of information, including, *inter alia*, the child's "present levels of academic achievement and functional performance," "measurable annual goals," "a statement of the special education and related services and supplementary aids and services, based on peer-reviewed research to the extent practicable, to be provided to the child, or on behalf of the child, and a statement of the program modifications or supports for school personnel that will be provided for the child." 20 U.S.C. § 1414(d)(1)(A)(i)(I), (II), (IV).

In addition to the substantive right to a FAPE, "the IDEA guarantees certain procedural rights, including," *inter alia*, "the rights of parents to 'participate in meetings' regarding the identification, evaluation, and placement of their child." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 330 (4th Cir. 2024) (quoting 20 U.S.C. § 1415(b)). "Although the IDEA envisions a cooperative process between parents and educators, the statute anticipates that they 'will not always agree.'" *D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, 171 F.4th 255, 260 (4th Cir. 2026), *cert. denied sub nom.*, No. 26-215, 2026 WL 2976890 (U.S. Oct. 5, 2026) (quoting *Bouabid v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 62 F.4th 851, 856 (4th Cir. 2023)). In that instance, "parents may seek a due process hearing in the appropriate state administrative forum," where "an impartial hearing officer determines whether the child received a free appropriate public education." *Id.* (first citing 20 U.S.C. § 1415(f); and then quoting *Sanchez v. Arlington Cnty. Sch. Bd.*, 58 F.4th 130, 133 (4th Cir. 2023)). "[A]ny party aggrieved by the findings and decision made under this subsection, shall have the right to bring a civil action with respect to the complaint presented." 20 U.S.C. § 1415(i)(2)(A).

**B. J.K.'s Educational History**

***1. Educational History with DCPS***

J.K. attended District of Columbia Public Schools ("DCPS") from pre-kindergarten until January 2017 of his first-grade year when L.K. placed him at the Auburn School, a nonpublic day school. (AHD ¶¶ 3–6.) Following a neuropsychological evaluation in October 2017, DCPS placed J.K. at the Kennedy School, another nonpublic day school. *Id.* ¶ 7. He later transferred to the Phillips School, another nonpublic day school in Fairfax, Virginia, where he remained until his family moved to Anne Arundel County in August 2020. *Id.* ¶¶ 8–9. At the time of his move to Anne Arundel County, J.K.'s IED from DCPS "called for a full day of special education services as a diploma-bound student." *Id.* ¶ 10.

***2. 2020-2021 and 2021-2022 School Years / Fifth and Sixth Grades***

Following Plaintiffs' move to Anne Arundel County, J.K. became an AACPS student for his fifth-grade year. (AHD ¶ 9.) Based on his DCPS IEP, AACPS determined the comparable services for the 2020-2021 school year included a full day of special education services as a Maryland High School Diploma-bound student, and that its public school-based full-day special education services programs were not appropriate for J.K. *Id.* ¶¶ 11–12. Specifically, AACPS determined that its full-day special education programs "were geared more toward behavioral supports, which [AACPS] believed would not enable [J.K.] to handle a diploma track curriculum in the public-school setting." *Id.* ¶ 13. Thus, AACPS funded J.K.'s placement at the Harbour School ("Harbour"), a nonpublic day school, for the 2020-2021 school year. *Id.* ¶ 14. AACPS continued this placement for J.K.'s sixth grade, the 2021-2022 school year. *Id.* ¶ 15.

On August 17, 2022, J.K received a neuropsychological evaluation from Dr. Yuri Shishido with Children's National Hospital. (AHD ¶ 18.) Dr. Shishido's Report of Neuropsychological

Evaluation, issued August 31, 2022 (the "August 31, 2022 Neuropsychological Report"), reaffirmed J.K.'s diagnoses of moderate ID and ruled out a separate diagnosis of attention deficit-hyperactivity disorder. *Id.* ¶¶ 19–20. The August 31, 2022 Neuropsychological Report recommended, *inter alia*, J.K.'s placement continue in a "highly specialized setting" to include "small group or one-on-one instruction and modification of lesson/homework/exams to fit his cognitive levels, for the majority of his learning (*i.e.* non-public placement)." *Id.* ¶ 22.

### *3. 2022-2023 School Year / Seventh Grade*

AACPS again continued J.K.'s placement with Harbour for his seventh grade, the 2022-2023 school year. (AHD ¶ 23.) During the October 20, 2022, IEP team meeting, the IEP team determined J.K. would remain diploma-bound and participate in District and Statewide Assessments. *Id.* L.K. expressed her desire to have J.K. transitioned from a diploma-bound track to a certificate track. *Id.* ¶ 24. Lauren Hammett, an academic specialist for the Interagency and Nonpublic Placement Office with AACPS, noted that a change to J.K.'s certificate track would result in a different, and more structured, curriculum designed toward life skills, with such information "tied into class lessons and reviewed until a student becomes proficient and is able to retain it." *Id.* ¶ 26. L.K. viewed that positively, as she believed J.K. would benefit from repetition. *Id.* In view of J.K.'s "accessing of education curriculum with specialized instruction, supports, and accommodations," the IEP team decided to reconvene to discuss J.K.'s track change after an adaptive assessment. *Id.* ¶ 25. Additionally, AACPS provided L.K. with a prior written notice ("PWN") that reflected her request for a certificate track. *Id.* ¶ 27.

On December 18, 2022, AACPS school psychologist Mary Stuart Kempton performed an adaptive functioning assessment—the Adaptive Behavioral Assessment System, Third Edition

(ABAS-3).[2]—on J.K. with L.K.'s consent. (AHD ¶¶ 28–29.) She issued her Psychological Assessment Report on February 2, 2023 (the "February 2, 2023 Psychological Assessment Report"). *Id.* ¶ 30. Relevant here, she found:

> The Student's ratings for adaptive functioning within the school setting indicate that his functioning falls within the extremely low range when compared to same age peers, which was consistent with the estimate of overall cognitive ability from the August 31, 2022 Neuropsychological Report, but somewhat lower than the Parent's rations of adaptive behavior.
>
> The Student's ratings within the social domain were in the low range on teacher ratings when compared to his same age peers but were a personal strength for the Student when compared to his overall adaptive functioning, which was consistent with historical areas of strength and consistent with the parent ratings utilized for the August 31, 2022 Neuropsychological Report.

*Id.* ¶ 31.

An IEP team meeting was then held on February 23, 2023, at which L.K. agreed to allow AACPS "to conduct additional assessments of [J.K.] that would be required to consider the alternative curriculum, certificate track program." (AHD ¶ 32.) Therefore, on March 16 and 21, 2023, Shawn McCoy, J.K.'s non-public teacher specialist/case manager with AACPS, administered academic assessments to J.K. *Id.* ¶ 33. Additionally, on March 21, 2023, Dr. Shishido conducted another neuropsychological consultation on J.K., at L.K.'s request, regarding new impulsive behaviors (the "March 21, 2023 Neuropsychological Consultation"). *Id.* ¶ 35. Dr. Shishido made the following safety support recommendations:

> Given concerns for impulsive behavior and lack of awareness of common dangers, [J.K.] requires routine, explicit instructions, and supervision throughout the school day (including school bus pick up/drop off, transition between classes), with increased supervision during less structure times (*e.g.*, recess, field trips, vocational

[2] ABAS-3 "is a comprehensive norm-referenced assessment of adaptive skills needed to effectively and independently care for oneself, respond to others, and meet environmental demands at home, school, work and in the community." (AHD ¶ 29.) It has "three domains"—conceptual, social, and practical. *Id.*

> training, etc.). Continued access to escorting between classrooms is recommended.

*Id.* ¶ 37. That same day, L.K. requested an IEP meeting to discuss "adding environmental and behaviors supports" for J.K. *Id.* ¶ 38. The IEP team met on March 28, 2023, and, based on L.K.'s concerns, added "clear and consistent expectations with one to two step directions and positive reinforcers" to J.K.'s supplementary aids and services, as well as adding "transitioning in a timely manner" as an objective. *Id.* ¶ 39.

On March 30, 2023, Mr. McCoy issued his Academic Assessment Report ("March 30, 2023 Academic Assessment Report"), which reflected that J.K. was "performing in the very low range when compared to same age peers[,] in reading, writing, and math, with his reading at the kindergarten level and his math ranging between kindergarten and second grade levels." (AHD ¶¶ 40–41.) Relatedly, in May 2023, Mandy Decker, an occupational therapist, conducted an Occupational Therapy Re-Evaluation for School-Based Services for J.K., with a resulting report (the "May 2023 Occupational Therapy Report") detailing his social strengths. *Id.* ¶ 42.

***4. 2023-2024 School Year / Eighth Grade***

The IEP team convened an annual meeting for J.K.'s 2023-2024 school year on May 15, 2023. (AHD ¶ 43.) At that meeting, AACPS proposed that J.K. enter a certificate track, referred to as the Alternative Learning Outcomes or "ALO" track, as opposed to a diploma-bound track because he met "the criteria to pursue Maryland High School Certificate of Program Completion and the alternate state assessments based on alternate academic achievement standards." *Id.* ¶ 43. As part of that proposal, AACPS also proposed that J.K.'s IEP could be implemented at Arundel Middle in its Alternate Curriculum Classroom ("ACC") as a less restrictive environment as compared to Harbour. *Id.* ¶ 45. Arundel Middle, according to AACPS, would be a less restrictive setting and provide J.K. with opportunities to engage with non-disabled peers in the school day

while continuing to have access to specialized, small group instruction and opportunities for community-based instruction. *Id.* ¶ 46. AACPS further advised that a teacher or aide would remain with ACC students, even in the general education setting, and that ACC students continue to have supplementary aids, services, and accommodations listed in their IEP regardless of setting. *Id.* ¶¶ 47–48.

While L.K. initially agreed with AACPS's proposal as to the appropriateness of the certificate track, she disagreed with the proposal as to the placement change to Arundel Middle from Harbour. (AHD ¶¶ 44, 48.) L.K. communicated that J.K needed the consistency of Harbour and that a placement change to public school would "ruin him," and "make him vulnerable to other students." *Id.* ¶¶ 48–49. L.K. asked to defer such recommendation until the following year when J.K. would be entering high school, as it would present a more "natural transition time" and "provide him time to process the change." *Id.* ¶ 50. L.K. left the IEP team meeting with another PWN. *Id.* ¶ 51. Later that day, L.K. contacted Megan Lynch, Coordinator of Interagency and Nonpublic Placements with AACPS, to discuss her concerns and revoke her consent for the ALT Tool,[3] an assessment tool for participation in alternate assessments or instruction, *see* AACPS Ex. 10, and to have J.K. remain at Harbour. *Id.* ¶ 52. The next day, L.K. "confirmed in writing that she refusing to allow the AACPS to instruct [J.K.] using alternate academic achievement standards that do not provide credit toward Maryland High School Diploma, and refusing to allow AACPS to assess the Student with the alternate education assessments aligned with Maryland's alternate academic achievement standards." *Id.* ¶ 53.

[3] This refers to Alternate Appendix A: Participation Criteria and Checklist, which is required to be used "for participation in the alternate assessments and/or alternate instructional standards." (AACPS Ex. 10.)

The IEP team convened another meeting on July 11, 2023. (AHD ¶ 54.) L.K. attended with Christie Voltz Mandeville, an educational advocate. *Id.* ¶¶ 54–55. AACPS again proposed that J.K. pursue a Maryland High School Certificate of Program Completion, noting:

> That the Student has an IEP that includes specially designed instruction that requires accommodations, evidence-based practices, program modifications, and personnel support, and that there was evidence that the Student cannot access the general education standards despite ongoing interventions.
>
> That the August 31, 2022 Neuropsychological Report showed that the Student has a cognitive disability, the February 2, 2023 Psychological Assessment Report indicated that the Student's adaptive scores were in the very low range, and that the March 30, 2023 Academic Assessment Report demonstrated that the Student's academic levels were also in the very low range.
>
> That the Student has a cognitive disability that impacts his intellectual functioning and adaptive behavior, and as such the Student requires significantly modified learning content to enable him to access the knowledge and skills necessary to progress.
>
> That the Student requires extensive, direct, repeated, and individualized instruction and substantial support to achieve measurable gains in the grade and age-appropriate curriculum.

*Id.* ¶¶ 56–57. *See* Pls. Ex. 11-4.

AACPS again proposed to move J.K. to Arundel Middle ACC, as well as to reduce his special education hours to 19 hours per week and increase his general education classroom hours to 10 hours per week. (AHD ¶ 59.) As part of that proposal, AACPS explained:

> The change in hours would coincide with the Student moving to the Arundel Middle ACC, which as a lesser restrictive environment would have the Student inside a general education setting less than forty percent of the time.
>
> That based on the amount of services required to implement the Student's supplementary aids and services, and his goals and objectives, the Student required services inside an ACC for all core content classes, which would include academic instruction for language arts, math, science, and social students in small groups

> outside of the general education setting; however, the Student also required adult supported access to general education peers during his electives and at lunch, which is why the Student required enrollment in an ACC Program instead of a private separate day program.

(AHD ¶ 59.)

While L.K. agreed with AACPS's proposal that J.K. pursue a Maryland High School Certificate of Program Completion, she did not consent to J.K.'s participation in an alternative assessment or for J.K. to receive instruction using alternate standards that would not provide credits toward a Maryland High School Diploma based on her concern he would be moved from Harbour. (AHD ¶ 58.) L.K. detailed J.K.'s success at Harbour. *Id.* L.K. also disagreed with AACPS's proposal regarding the increase to his general education hours, asserting that J.K. required a full day of special education services in a small group setting and detailing his lack of success in the less restrictive environment while a part of DCPS. *Id.* ¶ 60. Following the meeting, L.K. again received a PWN. *Id.* ¶ 61.

On August 1, 2023, L.K. filed a due process complaint for J.K.'s continued placement at Harbour for the 2023-2024 school year. (AHD ¶ 62.) AACPS similarly filed a due process complaint regarding the provision of alterative achievement standards and alternative assessments. *Id.* ¶ 63. On October 12, 2023, L.K., individually and on behalf of J.K., and AACPS entered into a Release and Settlement of Claims (the "Settlement Agreement") resolving their due process complaints. *Id.* ¶ 64. Pursuant to the Settlement Agreement—AACPS would place J.K. at Harbour for his eighth grade, the 2023-2024 school year; L.K. would consent to allow AACPS to instruct J.K. using alternate academic achievement standards that do not provide credit toward a Maryland High School Diploma and to assess J.K. with the alternate education assessments; that J.K.'s educational placement or "stay put" placement for the 2024-2025 school year would be Arundel

High School's ("Arundel") ACC program; that the parties would work collaboratively during the 2023-2024 school year to develop a plan to transition J.K. to the Arundel ACC program for the 2024-2025 school year; that the IEP team would convene and conduct an annual review by May 15, 2025, to develop J.K.'s 2024-2025 school year IEP that would be drafted to align with ALO "curriculum and standards," and "if data was provided that prompted reconsideration of [J.K.'s] placement in Arundel's ACC, the team would review it and propose an alternative placement"; and that L.K. maintained the right to exercise her parental rights if she disagreed with decisions of the IEP team but J.K.'s stay put placement was Arundel's ACC program. *Id.* ¶ 65.

Pursuant to the Settlement Agreement, the IEP team met on October 17, 2023, to create J.K.'s IEP for the 2023-2024 school year. (AHD ¶ 66.) The October 17, 2023 IEP called for J.K. to attend Harbour for the 2023-2024 school year and participate in a certificate track program geared toward the Certificate of Program Completion as opposed to a high school diploma. *Id.* At that meeting, L.K. communicated that she was not in agreement with transitioning J.K. to Arundel ACC for the 2024-2025 school year, believing he should remain at Harbour. *Id.* ¶ 67.

***5. About the Arundel ACC Program and Transition Planning***

The Arundel ACC program, an ALO program, "is a self-contained special education program that is housed within the general education setting at Arundel." (AHD ¶ 70.) "It is designed to provide intensive small-group instruction in core academic areas for its participants in separate classrooms." *Id.* Students who participate in the Arundel ACC program "can have a combination of classes in both the special education and general education setting that is specially tailored to meet their individual strengths and needs." *Id.* ¶ 71. The Arundel ACC program "includes community-based instruction that begins in ninth grade and focuses on practical skills, such as money, that would be practices in the classroom and then later practices in community

settings to generalize the skill." *Id.* ¶ 73. It also "provides programmatic support to its students," including requiring a teacher or aide remain with its students when they are in the general education setting, providing students with their supplementary aides and services, and following the IEP accommodations in all settings. *Id.* ¶ 77.

Prior to March 15, 2024, Mr. McCoy created a draft school placement transition plan (AACPS Ex. 29; the "Transition Plan") to guide J.K.'s transition to the Arundel ACC program (per the Settlement Agreement) and emailed L.K. regarding same. (AHD ¶¶ 90–92.) The Transition Plan identified activities to aid J.K. in his transition to Arundel, including, *inter alia*, Mr. McCoy and the Arundel team meeting with the Arundel special education chair to discuss supports for J.K., touring the Arundel ACC program, having the Arundel ACC program specialist/special education department chair observe J.K. at Harbour, having a shadow morning in the Arundel ACC program, and providing "social stories" to J.K. regarding the Arundel ACC program with pictures of school locations and new school areas (sent through both Harbour and L.K.). (AACPS Ex. 29.)

Mr. McCoy scheduled a tour of the Arundel ACC program for L.K. and J.K. on April 4, 2024. *Id.* L.K. and J.K., along with Mr. McCoy, Ms. Mandeville, and Anica Ditchkofsky, Student Services Coordinator at Harbour, toured the program—visiting classrooms, observing students who would be in J.K.'s ACC class, observing a lesson in the ACC classroom and a physical education ("PE") class with non-disabled peers, and participating in a question and answer session. *Id.* ¶¶ 95–105. Additionally, after the May 2024 IEP meetings, Mr. McCoy collaborated with Harbour staff to provide "social stories" to give J.K. "visuals of what the school environment would look like," and scheduled a shadow day for J.K. to visit Arundel. (AHD ¶¶ 151-57.)

*6. April 2024 Letters and May Observation Completed in Advance of the 2024-2025 IEP Team Meeting*

At L.K.'s request, Phylicia Baker, an LCSW-C who began counseling J.K. in January 2024, submitted a letter in April 2024 in advance of J.K.'s 2024-2025 IEP team meeting regarding what she thought would be helpful in his school environment, including opining that J.K. was "in a therapeutic learning environment that supported his mental health and helped him fully access his education" at Harbour. (AHD ¶¶ 109–12.) Ms. Baker's counseling of J.K. was conducted by way of 45-minute weekly telehealth appointments. *Id.* ¶ 106–108.

Dr. Linda J. Jacobs, Harbour's founder and Executive Director, also provided a letter to L.K.'s attorney on or about April 17, 2024, detailing instructional program recommendations for J.K, and noting that Harbour did not place students on a certificate or diploma track, and explaining what classes she anticipated J.K. would take the following year (two for zero credits, three for one credit, and one for either no or one credit). (AHD ¶ 113, 116–17.) Dr. Jacobs' letter also detailed J.K.'s social success at Harbour and expressed her opinion that Harbour presented J.K. with "the least restrictions for a full school experience." (AHD ¶ 118; Pls. Ex. 20-2.)

Seemingly also on L.K.'s request, Ms. Mandeville observed J.K. at Harbour from 9:30 a.m. to 10:30 a.m. on May 8, 2024. (AHD ¶ 127; Pls Ex. 22.) Ms. Mandeville had met J.K. on one prior occasion, at the tour of the Arundel ACC program, where she engaged in "small talk" with him intermittently while on the tour. (Tr. at 341:19–343:12.) Ms. Mandeville has never evaluated J.K. (AHD ¶ 128.) Based on her observation, Ms. Mandeville identified J.K.'s strengths, drew comparisons between instruction at Harbour and instruction in "the larger environment in a public school building with a self-contained classroom," and recommended that J.K. "be provided programming in independent living skills and career readiness with functional academic content

as well as continue engaging in diploma level classes with peers at his social level." (AHD ¶¶ 127–29; Pls. Ex. 22.)

The above letters and observations were provided to the May 2024 IEP team. (AHD ¶¶ 11, 116, 130.)

*7. April 29, 2024 Pre-Planning Meeting*

With regard to general practices, the ALJ found:

> In preparation for IEP meetings, the AACPS conducts internal pre-planning meetings with Harbour's staff to review the data and information collected for all its students' upcoming IEP Meetings. Before the pre-planning meetings, Harbour staff draft data in electronic format. During the pre-planning meetings, AACPS staff and Harbour staff discuss the data and copy appropriate information into a draft IEP using IEP forms in preparation for upcoming IEP meetings. Parents are not invited to these meetings.
>
> As a general best practice, the AACPS has these meetings for all its students placed at Harbour, and a draft IEP is created at the end of the pre-planning meeting.
>
> After the pre-planning meeting the draft IEP is sent to parents in advance of the upcoming IEP meeting, so that the parents can review the draft IEP and discuss it with the IEP team at the IEP meeting.

(AHD ¶¶ 119–121.)

In accordance with the foregoing, on April 29, 2024, AACPS staff met with Harbour staff to prepare J.K.'s draft IEP. (AHD ¶ 122.) Relevant here, at that meeting, Ms. Ditchkofsky stated that, based on her observation of the Arundel ACC program during the tour, she thought J.K. could fit with either Harbour or the Arundel ACC program. *Id.* ¶¶ 124–25. A draft IEP was created and sent to L.K. in advance of the upcoming IEP team meeting. *Id.* ¶ 126. L.K. did not learn of this pre-planning meeting until during the due process hearing after she had completed her evidentiary case. (Tr. at 1092:11–21.)

### C. May 2024 IEP Team Meetings for the 2024-2025 School Year / Ninth Grade

J.K.'s IEP team met on May 9, 2024, to discuss his 2024-2025 school year IEP and placement. (AHD ¶ 131.) L.K. attended with her attorney and Ms. Mandeville; Mses. Dithckofsky, Miskell (special educator), Brown (speech language pathologist), Decker, and Lore (school social worker) attended from Harbour; and Mses. Lynch, Hammett, Oyinlola (special education program specialist), and Mr. McCoy attended from AACPS. *Id.* ¶ 132. The team did not resolve J.K.'s 2024-2025 IEP and placement at the meeting, so another meeting was scheduled for May 17, 2024.[4] *Id.* ¶¶ 133–34.

The IEP team met again on May 17, 2024, as planned. (AHD ¶ 135.) Again L.K. attended with her attorney; Harbour was represented by Mses. Ditchkofsky, Miskell, Brown, Decker, Lore and McGarry (transition coordinator); and AACPS was represented by Mses. Lynch, Hammett, Oyinlola, and Mr. McCoy. *Id.* The May 17, 2024 IEP addressed in detail the areas affected by J.K.'s disability, including communication, listening comprehension, math calculation, reading phonics, and written language mechanics in the academic area; social interaction and skills in the behavioral area; and visual motor skills in the physical area. *Id.* ¶ 136. *See also* AACPS Ex. 15.1. It noted J.K.'s present performance levels in social/emotional/behavioral areas (and others), including noting his strength in identifying types of relationships with peers, identifying social rules, acting to please peers/staff, and interest in making friends, as well as his progress toward his IEP goals at that time. *Id.* ¶ 137. It also reflected areas of social improvement, including in hygiene skills, consistency and independence with prompts and modeling. *Id.* ¶ 138.

---

[4] L.K.'s counsel "requested to have the meeting in two parts because he wanted to touch base with [L.K.] regarding her decision for participation in the alternate assessment and instruction. He agreed to go past the deadline that was in the [Settlement Agreement] for the conclusion of the IEP meeting." (AHD ¶ 133; Pls. Ex. 23-4.)

The proposed May 17, 2024 IEP provides for social skills development by a special education teacher and instructional assistant daily, in addition to other supplementary aids and supports, to address J.K.'s need for opportunities for explicit social skill instruction and participation in a social skills initiative program. (AHD ¶ 139.) One proposed support was "Adult Support" to be provided by special education classroom teachers, general education teachers, and/or instructional assistants, for transitioning between classes, arrival/dismissal, restroom breaks, and daily community-based activities across settings. *Id.* ¶ 140. Based on L.K.'s input, J.K.'s present levels of performance, supplementary aids and supports, and J.K.'s goals and objectives, AACPS proposed the following services, which it determined were responsive to J.K.'s needs: classroom instruction for 21 hours per week; four 30-minute counseling sessions a month; two 30-minute speech language therapy sessions a week; four 30-minute occupational therapy sessions a month; and daily transportation.[5] *Id.* ¶¶ 141–42. AACPS also proposed that J.K.'s least restrictive environment ("LRE") was a general education setting for less than 40% of the time. (ADH ¶ 144.)

L.K. disagreed with this proposal based on her belief that J.K. required a full day of special education services due to "his need to be in an educational environment that is peer-matched, and that would give him instruction based on both general education and alternate academic achievement standards." (AHD ¶ 143.) *See* Pls. Ex. 26. L.K. similarly disagreed with AACPS's proposal regarding J.K.'s LRE, requesting placement outside of the general education environment in a private separate day program. (AHD ¶ 144.)

[5] On L.K.'s request, the May 17, 2024 IEP transportation requirement was modified based on her representation that J.K. did not require a parent (or designee) to meet him at the bus stop "because the bus drops [J.K.] off at his apartment door, and [J.K.] could independently go into the home." (AHD ¶ 148.)

Ultimately, the IEP team adopted AACPS's proposals based on their consideration of L.K.'s input, staff input, J.K.'s present levels of performance, supplementary aids and supports, and J.K.'s goals, objectives, and services. (AHD ¶¶ 142, 145.) The IEP team determined that J.K.'s IEP could be implemented at the Arundel ACC program. *Id.* ¶ 145. It noted that the less restrictive setting would provide J.K. with opportunities to engage with non-disabled peers throughout the school day while maintaining specialized small group instructions, with opportunities for community-based instruction. *Id.* Consistent with her opposition to AACPS's proposal, L.K. disagreed with the IEP, requested J.K. remain at Harbour, and asserted that he needed a full day of special education services. *Id.* ¶ 146. The IEP team rejected L.K.'s request for the reasons discussed above. *Id.* ¶ 147. L.K. advised that J.K. would not attend the Arundel ACC program and instead would remain at Harbour. *Id.* ¶ 149. L.K. received a PWN following the meeting. *Id.* ¶ 150.

**D. Due Process Complaint**

On May 28, 2024, L.K. filed a Due Process Complaint with the Maryland Office of Administrative Hearings ("OAH") alleging that AACPS substantively violated the IDEA by denying J.K. a FAPE for the 2024-2025 school year.[6] (AHD at pp. 1–2.) She requested an administrative hearing and findings that AACPS denied J.K. a FAPE for the 2024-2025 school year, that L.K.'s unilateral placement of J.K. was appropriate, and that L.K. is entitled to tuition reimbursement and related costs for J.K.'s attendance at Harbour for the 2024-2025 school year under the IDEA. *Id.* at p. 2. A seven-day hearing was convened on September 4, 10, 11, 12, 18, 19, and October 1, 2024. *Id.* at p. 5. At the hearing, L.K. offered three witnesses, in addition to testifying herself: Ms. Jacobs (accepted as an expert in special education), Ms. Baker (accepted as

[6] L.K. seemingly filed the Due Process Complaint individually and on behalf of J.K. *See generally* AHD at p. 1.

an expert in social work), and Ms. Mandeville (accepted as an expert in special education). *Id.* at p. 6. AACPS offered four witnesses: Ms. Lynch (accepted as an expert in special education), Mr. McCoy (accepted as an expert in special education), Ms. Kempton (accepted as an expert in school psychology), and Ms. Hammett (accepted as an expert in special education). *Id.* at pp. 6–7.

The parties stipulated (i) that L.K. and J.K. did not challenge the appropriateness of J.K.'s IEP as to the present levels of his academic achievement and functional performance (present levels of performance); (ii) that the curriculum and state testing standards on the IEP aligned with ALOs, standards, and assessments; (iii) to the finding that J.K. qualifies for ALOs standards pursuant to Appendix A (which, as discussed above, is required to be used "for participation in the alternate assessments and/or alternate instructional standards," *see* AACPS Ex. 10); and (iv) to the instructional accommodations and modifications, supplemental aids and services other than adult support, goals and objectives, and related services. *Id.* at p. 7. Thus, as the ALJ remarked, "the primary issues in [the] case are whether the AACPS has failed to provide the Student with FAPE by a deficiency in supplemental aids and services on the IEP for adult support, by a deficiency in the number of special education service hours, and by determining that the Arundel AAC was his LRE and appropriate placement." *Id.* at p. 50–51.

ALJ Andrew J. Brouwer issued his 73-page AHD on October 31, 2024. ALJ Brouwer concluded that J.K. was not denied a FAPE for the 2024-2025 school year; that the May 17, 2024 IEP was reasonably calculated to address J.K.'s unique disability-related needs; and that L.K. was not entitled to reimbursement for Harbour tuition for the 2024-2025 school year. *Id.* at p. 73. As to the alleged procedural violation discussed above, ALJ Brouwer concluded that it was "not before [him] because [L.K.] did not raise it in her Due Process Complaint." *Id.* Nonetheless, he noted that, were it properly before him, he would find that L.K. had "not produced sufficient

evidence to persuade [him] that the AACPS was unwilling to consider the parent's long-standing position at the May IEP meetings with an open mind," and thus would have found she failed to meet her burden. *Id.* at p. 50.

**E. The Instant Action**

On February 14, 2025, Plaintiffs initiated this action against Defendants. (ECF No. 1.) Plaintiffs seek review of the ALJ's decisions pursuant to the IDEA, contending the ALJ erred in his conclusions; they ask this court to declare Defendants violated Plaintiffs' rights, and order Defendants reimburse Plaintiffs for tuition expenses and costs incurred in J.K.'s enrollment at Harbour for the 2024-2025 school year. (ECF No. 1 ¶¶ 65–67, p. 13; the "Complaint.") Both sides now seek summary judgment. (ECF Nos. 25, 26.)

## II. STANDARD OF REVIEW[7]

"An action filed in federal district court pursuant to the IDEA 'is an original civil action, not an appeal from a state administrative agency.'" *Charlotte-Mecklenburg Cnty. Bd. of Educ. v. Brady*, 66 F.4th 205, 211 (4th Cir. 2023) (quoting *Johnson v. Charlotte-Mecklenburg Schs. Bd. of Educ.*, 20 F.4th 835, 844 (4th Cir. 2021)). The court "cannot affirm, reverse, vacate, or remand the state hearing officer's decision." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 330 (4th Cir. 2024) (citing *Johnson*, 20 F.4th at 845–46). Instead, it "conducts an independent review, deferring to the hearing officer's 'regularly made' factual findings and ordering substantive or procedural relief as

[7] As is typical in actions rooted in administrative hearings, the parties have filed cross motions for summary judgment. The Fourth Circuit has recently clarified that "[a]lthough a district court's review of IDEA administrative proceedings is typically conducted on motions for summary judgment, this is a procedural misnomer." *G.M. by E.P. v. Barnes*, 114 F.4th 323, 333 n.2 (4th Cir. 2024) (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 516–517 (4th Cir. 2014)). Instead, the task of the court is, as addressed above, to "(1) receive the record of the administrative proceeding, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of the evidence." *Id.* Inasmuch as the parties' summary judgment briefing and the administrative record have "provided the information the Court needs to conduct a modified *de novo* review of the ALJ's decision in accordance with Fourth Circuit and Supreme Court law," *S.M. ex rel. D.M. v. McKnight*, No. CV DLB-23-1387, 2024 WL 4349740, at *11 n.8 (D. Md. Sept. 30, 2024), the court considers the Motions.

necessary." *G.M.*, 114 F.4th at 330 (quoting *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991)).

The court "is obliged to conduct a modified de novo review, giving 'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002) (first citing *Board of Educ. v. Rowley,* 458 U.S. 176, 206 (1982); then citing *Doyle,* 953 F.2d at 103). To afford such "due weight," the court "treat[s] the state hearing officer's factual findings and credibility determinations as '*prima facie* correct, akin to the traditional sense of permitting a result to be based on such fact-finding,' so long as the findings were 'regularly made.'" *G.M.*, 114 F.4th at 334 (quoting *Doyle*, 953 F.2d at 105). In contrast, "when an ALJ has strayed 'so far from the accepted norm of a fact-finding process' that its findings were not 'regularly made,'" the ALJ's findings are not entitled to deference. *Bouabid v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023) (quoting *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008)). Where the court deviates from the ALJ's fact-findings, it is "required to explain why." *Doyle*, 953 F.2d at 105.

"After giving the administrative fact-findings such due weight, if any, the district court then is free to decide the case on the preponderance of the evidence, as required by the statute." *Id.* This court makes the "ultimate decision as to whether the state has complied with the IDEA." *R.F. by & through E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 245 (4th Cir. 2019). (citing *Sumter Cty. Sch. Dist. 17 v. Heffernan ex rel. TH*, 642 F.3d 478, 484 (4th Cir. 2011)). At its core, the district court must "(1) receive the record of the administrative proceeding, (2) hear additional evidence at the request of a party, and (3) base its decision on the preponderance of the evidence." *G.M.*, 114 F.4th at 333 n.2 (quoting *E.L. ex rel. Lorsson v. Chapel Hill-Carrboro Bd. of Educ.*, 773 F.3d 509, 516–517 (4th Cir. 2014)). "In making this independent decision, courts should not

'substitute their own notions of sound educational policy for those of the school authorities which they review.'" *R.F.*, 919 F.3d at 245 (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist. v. Rowley*, 458 U.S. 176, 206 (1982)). Plaintiffs, as the parties seeking relief under the IDEA, bear the burden of proof. *G.M.*, 114 F.4th at 334 (citing *O.S. v. Fairfax Cnty. Sch. Bd.*, 804 F.3d 354, 360 (4th Cir. 2015)).

## III. ANALYSIS

As discussed above, Plaintiffs urge that AACPS did not offer or provide J.K. with a FAPE for the 2024-2025 school year, and that the ALJ erred in finding to the contrary. (ECF No. 1 ¶¶ 62–67; ECF No. 25-1.) It their Motion, Defendants argue the opposite: that the ALJ's determinations were not erroneous and that the court should find that AACPS provided J.K. with a FAPE for the 2024-2025 school year. (ECF No. 26-1.)

### A. Preliminary Considerations

#### *1. Weight Afforded to the ALJ's Findings of Fact*

Whether an ALJ's findings were regularly made is determined by looking at the "*process* through which the findings were made," as opposed to the result of that process. *G.M. by E.P. v. Barnes*, 114 F.4th 323, 334 (4th Cir. 2024) (emphasis in original) (quoting *Bouabid v. Charlotte-Mecklenburg Sch. Bd. of Educ.*, 62 F.4th 851, 857 (4th Cir. 2023)). As the Fourth Circuit put it, an administrative hearing officer's findings are regularly made where he "conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the [hearing officer] by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty., Va.*, 516 F.3d 254, 259 (4th Cir. 2008); *G.M.*, 114 F.4th at 334 (same).

To the extent Plaintiffs argue the ALJ's findings were not regularly made,[8] they appear to raise two challenges—(i) the ALJ should not have afforded AACPS's witnesses with deference, and (ii) the ALJ improperly credited AACPS's expert witness testimony contrary to other evidence. These challenges, however, "import[] a merits conclusion into what is supposed to be a procedural inquiry." *See G.M.*, 114 F.4th at 335, *supra*. On this point, the Fourth Circuit has helpfully explained:

> G.M.'s overarching contention is that the "ALJ's factual findings and credibility determinations are inconsistent with the evidence and thus, not regularly made." Opening Br. 22–23. This argument is virtually always bound to fail because it imports a merits conclusion into what is supposed to be a procedural inquiry. *See Bouabid*, 62 F.4th at 857. We cannot know what is inconsistent with the evidence until we consider the merits and figure out whose interpretation of the evidence is correct. And that substantive inquiry would defeat the point of focusing on procedure, namely, to accord proper deference to the "original finder of fact" in this necessarily "fact-intensive" class of cases. *T.B., Jr. ex rel. T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 574–575 (4th Cir. 2018) (internal quotation marks omitted). We thus reject G.M.'s attempt to merge this procedural inquiry with the merits.

*Id.* Here, too, Plaintiffs' arguments do not turn on the procedure employed but rather whether the ALJ's fact findings and credibility determinations were correct. Their challenge conflates the inquiries.

Even considering Plaintiffs' challenges, the court is not persuaded. Plaintiffs first argue the ALJ erred in affording AACPS's witnesses deference when they failed to "offer cogent and responsive explanation" for AACPS's reduction in J.K.'s IEP hours in the May 17, 2024 IEP or with regard to the inclusion of adult support as a supplementary aid and service in the May 17,

[8] Plaintiffs assert in conclusory fashion: "Where, as here, findings are not regularly made, or the Hearing Officer's application of law to facts is erroneous, an administrative decision merits little deference." (ECF No. 25-1 at p. 11.) Because Plaintiffs proceed to challenge the ALJ's findings of facts and credibility determinations, the court infers Plaintiffs challenge that the findings of fact were regularly made. *Id.* at pp. 19–27.

2024 IEP. (ECF No. 25-1 at pp. 21–25.) Regarding the reduction in hours, Plaintiffs assert that AACPS did not explain the reduction in J.K.'s special education hours and that the "ALJ ignored the lack of explanation." (ECF No. 25-1 at p. 21.) This is simply untrue. The AACPS expert witnesses, and the ALJ's decision, addressed exactly this point. The AHD includes an entire section on "Special Education Service Hours," which details the change in recommendation, the history of recommendations regarding decreasing J.K.'s hours when considering changing him to an ACC program (and communications with L.K. regarding same), expert testimony offered by AACPS's witnesses regarding the reduction in hours, why the ALJ found such testimony persuasive against the backdrop of Plaintiffs' challenge, and the role of the ACC program placement referral related to the hours reduction.[9] (AHD at pp. 54–56.)

The same is so with adult support as a supplementary aid and service; the ALJ provided a full overview that identified the basis for the addition, credited AACPS's witnesses testimony on this point, and explained why he found the testimony persuasive. *Id.* at pp. 51–54. While the court appreciates that Plaintiffs disagree with AACPS's reasoning and the ALJ's credit extended to same, nothing before the court supports that the ALJ afforded AACPS's expert witnesses blind deference effectively amounting to an abdication of his responsibility to decide the case. *See J.P.*, 516 F.3d at 259 and *G.M.*, 114 F.4th at 334, *supra*. To the contrary, the AHD squarely addresses this in full and details the ALJ's reasoning; nothing in the AHD supports that the ALJ reached such a conclusion through arbitrary methods, such as "flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case." *J.P.*, 516 F.3d at 259, *supra*.

[9] Plaintiffs challenge this finding as essentially relying on a *post hoc* explanation offered outside of the IEP that leaves essential services not included in the actual IEP document. The court is not persuaded. The May 17, 2024 IEP identifies Arundel as the placement, which would necessarily include the default services within the ACC program at that institution. (AACPS Ex. 15.)

The same is so with regard to Plaintiffs' challenge to the ALJ's credibility calls and determination that he found AACPS's experts to be more persuasive than Plaintiffs' experts (as well as L.K.'s fact witness testimony).[10] (ECF No. 25-1 at pp. 25–27.) Importantly, "the ALJ in an IDEA case need not 'explain in detail its reasons for accepting the testimony of one witness over that of another.'" *Bouabid*, 62 F.4th at 859 (quoting *Cnty. Sch. Bd. of Henrico Cnty., Virginia v. Z.P. ex rel. R.P.*, 399 F.3d 298, 306 (4th Cir. 2005)). As *Bouabid* explains:

> Credibility determinations run the gamut. A fact-finder may conclude, for example, that inconsistencies in witness testimony undermine a witness's credibility. Or a judge may assess credibility based simply upon an intuitive impression of candor. This latter is often difficult to explain and appellate courts have been reluctant to require it. To the extent a rudimentary explanation is required, the ALJ obliged by mentioning that she took into account "the demeanor of the witnesses, any interests, bias, or prejudices [they] may have, [their] opportunity . . . to see, hear, know or remember the facts or occurrences about which the witnesses testified," as well as the reasonableness and plausibility of their testimony. J.A. 383. If anything, by specifying which witnesses she found most credible, the ALJ here went further than her counterpart in *J.P.*, who received deference despite merely stating that he "found all the witnesses credible." 516 F.3d at 260.

*Id.*

Regardless, ALJ Brouwer provided a detailed explication of his credibility determinations, including the record evidence that he found valuable in arriving at same (*e.g.*, the August 31, 2022 Neuropsychological Report), and offering specific reasons he found the AACPS experts more persuasive (*e.g.*, weighing their qualifications, their awareness of J.K.'s record, participation in J.K.'s IEP team meetings, knowledge of Arundel ACC, and a history of observing, meeting with, or evaluating, J.K.). (AHD at pp. 60–64.) He further cited to Plaintiffs' witnesses' lack of

[10] On this point, Plaintiffs assert the ALJ erred in crediting AACPS's experts because, they contend, AACPS failed to provide L.K. with information and "provided no information regarding the efficacy of the ACC program." (ECF No. 25-1 at p. 27.) For the reasons set forth above, the court is not persuaded this constitutes a lack of administrative hearing process to justify a conclusion that the ALJ's findings and credibility determinations were not regularly made.

knowledge of the Arundel ACC program and the student population therein, and lack of engagement with or minimal observation of J.K. with respect to his IEP meetings and in the classroom (as to Jacobs, Mandeville, and Baker).[11] *Id.* at pp. 64–71. Again, the court understands that Plaintiffs read the evidence differently, but what they challenge is the ALJ's determination, not the procedure employed.[12] At bottom, Plaintiffs' argument is that the ALJ erred because he did not find their witness testimony persuasive and instead credited opposing evidence. *See A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 329 (4th Cir. 2004).

The court is satisfied the ALJ's findings were regularly made. He convened a seven-day hearing during which both sides advanced argument, put on witnesses, and offered voluminous evidence. He subsequently issued a thorough and comprehensive 74-page decision, with 159 findings of fact, analysis, and, ultimately, his conclusions of law.[13] He detailed therein his consideration of the evidence, the weight he afforded such evidence, as well as his credibility determinations and basis for same. Such a process "is not 'far from the accepted norm of a fact-finding process.'" *G.M.*, 114 F.4th at 334 (quoting *J.P.*, 516 F.3d at 259). *See J.P.*, 516 F.3d at 259–60 (noting there was "nothing in the record suggesting that the hearing officer's process in

---

[11] The AHD recognized that L.K.'s testimony was not offered as an expert. (AHD at p. 70.)

[12] Plaintiffs further argue that the ALJ's crediting the testimony of AACPS's witnesses was in error because he did not acknowledge that it was "painfully clear" that "AACPS simply froze J.K's mother out of the entire process." (ECF No. 25-1 at p. 26.) For the reasons set forth elsewhere in this court's opinion, the court is not persuaded the record evidence supports such a conclusion.

[13] While the court does not quarrel with Plaintiffs' assertion that the length of the hearing or resulting decision are not alone dispositive, such factors are not irrelevant in the court's evaluating the process the ALJ employed:

> The ALJ's factual findings and credibility determinations were regularly made. The ALJ conducted a six-day hearing during which both sides were allowed to present evidence and arguments. Following that hearing, the ALJ issued a written decision explaining her determination. This process was well within the accepted norm of a fact-finding process, so the ALJ's findings are *prima facie* correct and can be relied upon when conducting our own independent review. *See J.P.*, 516 F.3d at 259; *Doyle*, 953 F.2d at 105.

*G.M. by E.P. v. Barnes*, 114 F.4th 323, 334–35 (4th Cir. 2024).

resolving the case was anything other than ordinary," meaning "the hearing officer conducted a proper hearing, allowing the parents and the School Board to present evidence and make arguments, and the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case"). The court may therefore treat the ALJ's "factual findings and credibility determinations as '*prima facie* correct,'" in its review of the cross motions. *See G.M.*, 114 F.4th at 334–35, *supra*.

***2. Deference Afforded to School Officials***

"IDEA requires great deference to the views of the school system rather than those of even the most well-meaning parent." *Id.* at 334 (quoting *A.B.*, 354 F.3d at 328). As such, the court's consideration of whether a school has provided a FAPE is not "an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 580 U.S. 386, 403–404 (2017) (quoting *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982)). Such deference, however, is not without limit. The degree of deference is "based on the application of expertise and the exercise of judgment by school authorities." *Endrew*, 580 U.S. at 404. A reviewing court expects such authorities "to offer a cogent and responsive explanation for their decisions that shows the IEP is reasonably calculated to enable the child to make progress appropriate in light of his circumstances." *Id.* As discussed above and throughout, the court agrees with the ALJ that AACPS offered such an explanation in support of the May 17, 2024 IEP and J.K.'s placement in the Arundel ACC program. The court thus affords their expertise appropriate considerable deference.

**B. Alleged Substantive Violation of the IDEA**

As discussed above, the IDEA "guarantees a substantively adequate program of education to all eligible children." *Endrew*, 580 U.S. at 394 (citing *Rowley*, 458 U.S. at 200–202). The substantive requirements of the IDEA are met where the school provides a child with a FAPE. *R.F. by & through E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 245 (4th Cir. 2019) (citing *M.L. ex rel. Leiman v. Smith*, 867 F.3d 487, 499 (4th Cir. 2017)). Ultimately, "[t]o meet its substantive obligation under the IDEA, a school must offer an IEP reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Endrew*, 580 U.S. at 399. This results from a "fact-intensive exercise . . . informed not only by the expertise of school officials, but also by the input of the child's parents." *Id.* The analysis is grounded in "the unique circumstances of the child." *Id.* at 404. "Courts conduct this analysis with an understanding that 'crafting an appropriate program of education requires a prospective judgment by school officials.'" *R.F.*, 919 F.3d at 250 (quoting *Endrew*, 580 U.S. at 399.) "Any review of an IEP must appreciate that the question is whether the IEP is *reasonable,* not whether the court regards it as ideal." *Endrew*, 580 U.S. at 399. With respect to educational placement for children with disabilities, the placements should be made by a group of persons knowledgeable about the child and based on the child's IEP. 34 C.F.R. §§ 300.116(a)(1), (b)(2).

To begin, J.K.'s May 17, 2024 IEP includes, *inter alia*, statements regarding J.K.'s present levels of academic achievement and functional performance, measurable annual goals to meet his needs, and a statement of the special education and related services and supplementary aids and services to be provided to J.K. *See* 20 U.S.C. § 1414(d)(1)(A)(i) (defining IEP and describing its required content and considerations). Indeed, the parties stipulated to the appropriateness of the IEP as to goals and objectives, J.K.'s present levels of performance, that J.K. qualifies for ALO

standards pursuant to Appendix A, that the curriculum and state testing standards per the IEP aligned with ALO standards, as well as to instructional accommodations and modifications, supplemental aids and supports (except as to adult support), and related services. (AHD at p. 7.)

Against the backdrop of these stipulations, Plaintiffs' challenges that AACPS "failed to provide [J.K.] with FAPE by a deficiency in supplemental aids and services on the IEP for adult support, by a deficiency in the number of special education service hours, and by determining that the Arundel AAC was his LRE and appropriate placement."[14] (AHD at pp. 50–51.) The bulk of Plaintiffs' argument turns on the appropriateness of the Arundel ACC program as a placement, citing a number of concerns that Plaintiffs contend the ALJ and AACPS failed to consider. (ECF No. 25-1 at pp. 28–34.) The court considers each in turn.

### *1. Reduction in IEP Hours and Insufficiency of Adult Support as a Supplementary Aid and Service*

J.K.'s May 17, 2024 IEP calls for a total of 21 hours of classroom instruction outside general education. (AACPS Ex. 15.47.) In contrast, J.K.'s July 11, 2023 IEP called for 19 hours of classroom instruction outside the general education setting and 10 hours of instruction in the general education setting. (AACPS Ex. 1.52.) Regarding this change, Plaintiffs contend:

> There was no explanation given by AACPS as to why J.K. no longer needed specialized instruction in the general education setting for the 2024-25 school year or how he could be successful without receiving direct specialized instruction for approximately one third of his school week, especially coming out of many years in a setting where he had spent no time in a general education setting.

(ECF No. 25-1 at p. 22.)

[14] While Plaintiffs' Motion does not appear to offer substantive argument that the IEP was inappropriate on grounds that the record supports that J.K. requires a greater number of special education hours or adult supports, and instead focuses on the insufficiency of the recommendation by AACPS, the court nonetheless considers this issue based on Plaintiffs' argument on this point presented to the ALJ.

Having reviewed the record, against the backdrop of the ALJ's factual and credibility findings, the court agrees with the ALJ on this point. As ALJ Brouwer explained:

> When the IEP team first proposed moving the Student from Harbour to an AACPS ACC program, it explained this issue to the Parent. During the May 15, 2023 IEP meeting, the AACPS explained to the Parent that when the ACC students were interacting or working alongside non-disabled peers or community members, they would be considered inside the general education environment, so services hours may look different; however, ACC students continue to have the supplementary aids and services and accommodations listed on their IEPs, across all settings. Further, as Mr. McCoy noted, the AACPS has determined that during electives, lunch, and recess, students should only have hours listed if they require specialized instruction.

(AHD at p. 55.)

Any reduction in hours is plainly read in context with the proposal that J.K.'s "appropriate placement and LRE was the Arundel ACC." (AHD at p. 55.) When asked the basis for the reduction, Ms. Lynch, accepted as an expert in special education with a concentration in intellectual disabilities and programming for students who are on ALO standards, explained: "[S]pecialized instruction is how we identify the hours. And in my professional opinion, he does not need specialized instruction during [electives]. He needs implementation of supplementary aids and services and other supports. So, it's not the specialized instruction part." (Tr. at 633:4–12.) Mr. McCoy, accepted as an expert in special education, echoed this contention. (Tr. at 794:4–15.)

The experts also addressed the context of the placement. Mr. McCoy explained that he thought J.K. "would be [a] success in the ACC program with less [sic] hours," based on "his most recent progress reports and present levels," as well as his "anecdotal observations, discussions with staff, input at the IEP meeting," with the same or increased adult support that was present in the ACC program. (Tr. 872:6–19.) He further asserted that he thought 21 hours was appropriate

"[b]ecause through speaking with the team and so forth, it was determined that [J.K.] would benefit from specialized instruction during those core math, reading, science, and social studies, and so forth," yet "during electives, he wouldn't require direct supervised instruction, just access to adult supportive supplementary aids and services." *Id.* at 873:5–13. Ms. Lynch added further on the proposed reduction:

> It was based on his strengths, looking at the recent assessment reports that were completed and reviewing the strengths and needs that Harbour School said that [J.K.] had in their current data, and looking at the supplementary page of the IEP and the accommodations that Harbour said that he required.
>
> . . . [W]hen you look at his strengths that his mom had for his rating scales and in the adaptive areas were social as a strength, and Harbour also had it as a relative strength. So, and additionally, Harbour on his transition information talked about all of his strengths in that social domain.

(Tr. 695:24–696:10.) The ALJ found both Mr. McCoy and Ms. Lynch credible on this matter and afforded their opinions great weight. (AHD at pp. 55–56.)

With regard to adult supports, a supplementary aid and service refers to "aids, services, and other supports that are provided in regular education classes or other education-related settings to enable children with disabilities to be educated with nondisabled children to the maximum extent appropriate" in accordance with the child's LRE. 20 U.S.C. § 1401(33). The May 17, 2024 IEP identifies adult support as a social/behavioral support for J.K., to be utilized with anticipated daily frequency by both special education classroom teachers (as primary), as well as general education teachers, instructional assistants, and other special education classroom teachers. (AACPS Ex. 15.34.) It provides: "Due to documented needs including parental input, school team input, and data regarding his functional independence during less structured times, [J.K.] requires adult

support for transitioning between all classes. Additionally, he also requires adult support for arrival/dismissal, restroom breaks, and community-based activities daily across settings." *Id.*

Plaintiffs question the sufficiency of the May 17, 2024 IEP as to adult support:

> While J.K.'s 2024 IEP does include an accommodation for adult support, it only explains that the support will be provided during transitions between classes, arrival/dismissal, restroom breaks, and community-based activities. AACPS Ex. 15.34. There is no explanation that this support will be provided during lunch and electives, nor was there any explanation as to how this adult support could meet J.K.'s needs instead of special education instruction during this time.

(ECF No. 25-1 at p. 24.) Again, the court disagrees. The identified adult support as a supplementary aid and service is read in the context of the Arundel ACC program placement, which, as the ALJ noted, ensures that ACC staff would go with J.K. as adult support to his elective. (Tr. at 512:21–513:11; 779:2–25.) Through the support at issue, J.K. would receive programmatic support both in the special education classes in the ACC classroom, as well as during electives, arrivals/dismissals, restroom breaks, and any community-based activities. (AHD at p. 52.) The proposed adult support also accounted for the findings of the August 31, 2022 Neuropsychological Report and the March 21, 2023 Report of Neuropsychological Consultation. *Id.* at p. 53. Plaintiffs do not argue, and the court does not find, such supports are insufficient.

Accordingly, the court does not find the reduction in special education hours or the addition of adult supports, alone or in conjunction, amounts to denial of a FAPE for the 2024-2025 school year. AACPS offered cogent and persuasive testimony as to both. Additionally, the IEP is read in the context of the existing programmatic support available as part of the Arundel ACC program.[15] While the court appreciates that Plaintiffs may disagree with these

[15] Plaintiffs' apparent contention that the adult support supplementary aid and service cannot be read in the context of the Arundel ACC program is curious. Indeed, to the extent Plaintiffs contend the May 17, 2024 IEP is insufficient because of inadequate adult support, this neglects that J.K. did not have adult support listed as a supplementary aid

recommendations,[16] the record supports that AACPS considered the "unique circumstances" of J.K. in reaching these recommendations, including various evaluations and his particular needs and goals. *See Endrew*, 580 U.S. at 404. The conclusion is further bolstered by the ALJ's findings of fact and credibility determinations on these same topics. Based on the foregoing, the court finds, contrary to Plaintiffs' contention, AACPS offered a cogent explanation for the reduction in hours and for the inclusion of adult support as identified in the May 17, 2024 IEP, with these proposals informed by other record evidence and the expertise of educational professionals. In view of these considerations, as well as the deference afforded to education professionals and the ALJ's factual findings and credibility determinations, the May 17, 2024 IEP was "reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances" on these points. *See Endrew*, 580 U.S. at 399, *supra*.

***2. Arundel ACC Program as an Appropriate Placement***

The main focus of Plaintiffs' challenge to the May 17, 2024 IEP is that the Arundel ACC program is not an appropriate placement for J.K. and thus that AACPS denied J.K. a FAPE for the 2024-2025 school year.

The IDEA requires children with disabilities to be educated in the LRE, meaning, "[t]o the maximum extent possible," they be "educated with children who are not disabled." 20 U.S.C. § 1412(a)(5)(A). Children with disabilities may only be removed from the regular educational environment where "the nature or severity of the disability of a child is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily." *Id.* "Mainstreaming" children with disabilities into the regular education environment, with

---

and service in his 2023-2024 IEP because, as the ALJ noted based on Ms. Mandeville's testimony, such support was not needed in view of the specific structure of Harbour.

[16] The court acknowledges the ALJ stated that Plaintiffs "did not expressly argue how the adult support in the IEP is deficient." (AHD at p. 53.)

potential "to study and socialize" with children who are not disabled, "is not only a laudable goal but is also a requirement of the [IDEA]." *DeVries By DeBlaay v. Fairfax Cnty. Sch. Bd.*, 882 F.2d 876, 878 (4th Cir. 1989). At the same time, however, it is not appropriate for every child. *Id.* "'[T]he proper inquiry is whether a proposed placement is appropriate under the [IDEA]'—in other words, whether a child's placement—the setting where the child learns—provides the child with a FAPE." *R.F.*, 919 F.3d at 246 (quoting *DeVries*, 882 F.2d at 878).

Plaintiffs offer a series of arguments detailing why the ALJ's finding that AACPS provided J.K. a FAPE for the 2024-2025 school year was incorrect. Based on the record, as well as the factual and credibility findings of the ALJ, the court agrees that the record supports that the Arundel ACC program placement was an appropriate placement and J.K.'s LRE. As the ALJ aptly noted, considerations regarding the LRE "constitute the heart of this case as the AACPS believes based upon [J.K.'s] social strengths and switch to a certificate track program, [J.K.] can succeed in an environment that is less restrictive than a full-time special education placement." (AHD at p. 57.) As an initial matter, there does not appear to be any real dispute that the Arundel ACC program can implement J.K.'s May 17, 2024 IEP. Further, testimony from AACPS's experts discussed why the placement—moving from a nonpublic day school with only students with disabilities to a public school with students both with and without disabilities—was appropriate, describing J.K.'s strengths, goals for the coming year, and the shift to alternative standards and instruction instead of a diploma-bound student. (ACCPS Ex. 15.13–15; Tr. at 526:6–528:1; 861:7–862:12; 950:20–956:16; 1041:8–1044:17.) As the ALJ noted, based on the credited testimony:

> When determining the Student's LRE at the May 17, 2024 IEP meeting, which the Parent attended, the IEP team considered the Parent's input, staff input, and the present levels of performance, supplementary aids and services, goals and objectives, and services. Having considered that information, the IEP determined that the Student's IEP could be implemented [at] the Arundel ACC, and

> noted that the lesser restrictive setting would provide the Student with opportunities to engage with his non-disabled peers throughout the school day, while continuing to have access to specialized, small group instruction and opportunities for community-based instruction. In addition, when the IEP team refused the Parent's request to have the Student remain at Harbour, it did so after considering the Parent's input, staff input, the present levels of performance, supplementary aids and services, goals and objectives, and services. The IEP team explained that it rejected the Parent's request for the Student to remain at Harbour, because the present levels of performance, supplementary aids and services, and the goals and objectives could be implemented in the public school environment, where the Student would have access to general education peers as language models when in general education elective classes and other environments. These explanations, which were both cogent and responsive, provided to the Parent at the May 17, 2024 IEP Meeting and later provided to her again in the May 17, 2026 PWN.

(AHD at p. 58.) The ALJ also detailed how the placement was supported by the August 31, 2022 Neuropsychological Report and the February 2, 2023 Psychological Assessment Report. *Id.* at p. 61.

Plaintiffs challenge that the Arundel ACC program is an appropriate placement for myriad reasons the court addresses below. Ultimately, none is persuasive; instead, at most, Plaintiffs' protest that the Arundel ACC program is not an "ideal" program, not that it is reasonable and appropriate to implement J.K.'s May 17, 2024 IEP. *See Endrew*, 580 U.S. at 399.

First, Plaintiffs raise "significant concerns with the peer group they observed in the ACC program for J.K.," as "there were three students who would be in his class who were nonverbal, and [] another student presented very childlike and [] J.K. would regress in that environment." (ECF No. 25-1 at p. 28.) Such concerns were raised by Plaintiffs and their expert, Ms. Mandeville, at the administrative hearing. On this point, the ALJ found Ms. Lynch's testimony to be more persuasive, noting that she had reviewed the students in the ninth and tenth grades of the Arundel ACC program and determined, in her expert opinion, that J.K. was appropriately peer matched.

(Tr. 667:13–668:6.) The ALJ also noted the persuasiveness of Ms. Hammett's testimony; she also reviewed Arundel ACC program student records and found that the students, in her opinion, constituted a good match for J.K. intellectually and communicatively.[17] (Tr. at 1036:1–16.) The ALJ credited their testimony and found it highly persuasive because Ms. Lynch and Ms. Hammett, unlike L.K. and Ms. Mandeville, had reviewed the records of those students who would be J.K.'s peers in the Arundel ACC program. The ALJ noted that L.K. and Ms. Mandeville (understandably) did not "kn[o]w anything about the students in the ACC program aside from what they observed on the tour."[18] (AHD at p. 70.) The court finds that such determinations support the ALJ's findings.

Additionally, the court finds Plaintiffs' challenge on this point regarding peer matching to be unpersuasive because it fails to acknowledge that the Arundel ACC program placement is also made with the goal that J.K. have opportunities to engage his non-disabled peers throughout the school day, opportunities tailored to J.K.'s May 17, 2024 IEP, including access to peers in the general education setting as language models.

Accordingly, upon review of the record, including the factual and credibility findings of the ALJ, the court agrees with the ALJ that the record supports that the Arundel ACC program placement was appropriate as to peer matching.

Second, Plaintiffs "describe[] concerns over the inability of J.K. to participate in extracurricular activities in AACPS at the same level he is able to at Harbour," because AACPS does not have "sports with inclusion," with Ms. Mandeville contending that J.K. would have

[17] Ms. Hammett did respond to inquiry on the concerns raised by L.K. and Ms. Mandeville about multiple nonverbal students. She testified that students may have different manners of communication resulting in communication through other forms. (Tr. at 1048:16–1049:5.) Ms. Lynch further confirmed that, even reviewing these students' records, she believed they were "similar peers" to J.K. (Tr. at 667:8–6.)

[18] While the court appreciates Plaintiffs' point that information about student peers will almost always be known by the school district staff rather than others, the underlying persuasiveness of the testimony remains, and the ALJ's general credibility determination were not so limited.

trouble getting accepted into extracurriculars. (ECF No. 25-1 at pp. 28–29; Tr. 335: 4–23.) This is not persuasive on the record here. As an initial matter, this argument is speculative and, at least in part, contradicted by other parts of the record; of note, the ALJ found that students in the Arundel ACC program can participate in the Special Olympics, join in extracurricular activities that both require and do not require tryout, and participate in unified sports that allow disabled and non-disabled students to participate on the same team. (AHD ¶¶ 75–76.) Additionally, Plaintiffs' perspective again neglects the goal of mainstreaming under the IDEA and J.K.'s goals (*e.g.*, peer modeling) and strengths (*e.g.*, his social strengths) as detailed in the May 17, 2024 IEP. Considering the ALJ's factual findings and credibility determinations, as well as the record before the court, Plaintiffs' concerns regarding extracurriculars similarly do not support a finding that the May 17, 2024 IEP or the Arundel ACC program as placement were inappropriate.

Third, Plaintiffs express concern regarding J.K.'s "safety and functioning in a larger environment," specifically noting concerns about bullying, peer pressure, and difficulty navigating social cues and expected behavior. (ECF No. 25-1 at p. 29–30.) The court appreciates these concerns. Nonetheless, the court again agrees with the ALJ's reasoning on this point. In the Arundel ACC program, J.K. would be in a self-contained classroom for his core academic classes. (AHD ¶¶ 70–71.) At all other times throughout his school day, J.K. would have the ACC staffing and, when applicable, the adult support addressed above (during transitions, arrival/dismissal, restroom breaks, and community-based activities). (AACPS Ex. 15.34.) There is also no dispute, as discussed throughout, that J.K.'s IEP includes "specific objectives to work on [the] areas of concern" related to social interactions in a larger social environment, peer pressure, and respectful peer interactions. (AHD at pp. 60–61; AACPS Ex. 15.14–15.) Based on the credited testimony, such objective is well-suited for the Arundel ACC program. The credited expert testimony at issue

provided impressions that J.K. would "benefit" from and "continue to improve" with engagement with non-disabled peers he would encounter through the Arundel ACC program. (AHD at p. 61–64.)

The court also observes that the Arundel ACC program's Best Buddies Program (a mentorship-type program) is relevant on this point, as it provides a supportive infrastructure for J.K.'s engagement of his nondisabled peers. (AHD ¶¶ 87–89.) Again, against the backdrop of the ALJ's factual findings and credibility determinations, the court does not find Plaintiffs' challenges persuasive or to support that AACPS denied J.K. a FAPE for the 2024-2025 school year.

Fourth, Plaintiffs contend that neither the ALJ nor AACPS considered "the obvious harmful effects of moving J.K. out of Harbour after so many successful years." (ECF No. 25-1 at p. 31.) Plaintiffs' argument, however, neglects the natural transition time and extensive transition planning (in collaboration with Harbour staff, *see* Tr. at 762:24–763:8) developed to support J.K. through such a move, including, *inter alia*, a tour of the ACC program, a meeting with Arundel special education staff, Arundel special education staff observing J.K. at Harbour, shadow opportunities, and provision of social stories with pictures of school locations (both through Harbour staff and L.K.). (AACPS Ex. 29.) The credited testimony also notes the natural transition time that the 2024-2025 school year presented for J.K., with Ms. Hammett providing:

> [A]s a ninth grader, . . . it's a good time to transition. Generally, this is when students start their high school career, so start their transition plans, community-based instruction. We want to have the time to build the skills in a self — in the ACC or in the self-contained environment, and then as students get older, we're ready to expose them to more experiences outside of the community.

(Tr. at 1042:15–22.) L.K.'s comments at the May 14, 2023 IEP team meeting confirm same, noting the natural transition point of starting high school. (AHD ¶ 50.) The ALJ detailed why he did not find Dr. Jacobs' testimony to the contrary persuasive, based on her indication that J.K. was

"close to finishing high school," and against J.K.'s history of transition between schools while within DCPS. (AHD at p. 71; Tr. at 47:10.)

The court agrees with the ALJ's findings on this point. Plaintiffs' argument does not turn on the appropriateness of the IEP or the placement, but rather, understandably, on the desire to keep J.K. where he is currently happy. That desire, however, does not support that the Arundel ACC program is not an appropriate placement to implement J.K.'s May 17, 2024 IEP, especially when read with the requirement that J.K. be educated with students who are not disabled to the extent feasible. *See* 20 U.S.C. § 1412(a)(5)(A). As discussed throughout, AACPS offers much in the way of supporting the reason for the transition and efforts to assist J.K. through such a transition. The court therefore does not find the foregoing constitutes a deprivation of FAPE under the IDEA.

Finally, Plaintiffs contend the ALJ and AACPS failed to consider J.K.'s "meaningful progress at Harbour." (ECF No. 25-1 at pp. 34–37.) The court disagrees. It appears that all involved recognized J.K.'s progress, as evidenced by his progress notes and strengths throughout his May 17, 2024 IEP. Nonetheless, simply because J.K. made meaningful progress at Harbour does not support that the Arundel ACC program is not a FAPE and J.K.'s LRE, especially against the backdrop of the substantive basis for the proposal by AACPS and later through the extensive testimony before the ALJ. And again, the record supports that J.K's placement on the ALO track presented a material change in the decision. On the record before it, the court is not persuaded J.K. was denied a FAPE for the 2024-2025 school year based on this reason.

At bottom, between the two May 2024 IEP team meetings, the IEP team—consisting of AACPS and Harbour staff, as well as L.K., her attorney, and Ms. Mandeville (as to at least one of the meetings), *see* 20 U.S.C. § 1414(d)(1)(B)—considered J.K.'s strengths and experiences, as

well as goals and objectives moving forward, and took into account the various assessments of J.K. in crafting the IEP. Based on these considerations, the IEP set goals and objectives uniquely tailored to J.K.'s circumstances. While the court appreciates that Plaintiffs disagree with the ultimate decisions of the May 17, 2024 IEP, including namely placement with the Arundel ACC program, the court agrees with the ALJ that, on the record before it, AACPS developed a comprehensive and tailored IEP for the 2024-2025 school year that was "reasonably calculated to enable [J.K.] to make progress appropriate in light of [his] circumstances," *see Endrew*, 580 U.S. at 399, and thus offered J.K. a FAPE in his LRE for the 2024-2025 school year.[19] *See also id.* (noting "the question is whether the IEP is *reasonable,* not whether the court regards it as ideal") (emphasis in original); *Hanson ex rel. Hanson v. Smith*, 212 F. Supp. 2d 474, 488 (D. Md. 2002) (explaining that "the insistence of parents that a non-public school setting is more appropriate does not establish the inappropriateness of the public school, even if the child would have benefitted more in the private setting") (citing *King v. Bd. of Educ. of Allegany Cnty., Maryland*, 999 F. Supp. 750, 767 (D. Md. 1998)).

**C. Alleged Procedural Violation**

The court turns finally to Plaintiffs' argument that the ALJ erred in rejecting their argument that AACPS procedurally violated the IDEA because it predetermined J.K.'s 2024-2025 placement recommendation in the May 17, 2024 IEP. (ECF No. 25-1 at pp. 15–19.) The Fourth Circuit has explained:

> Whether a state has violated the IDEA has procedural and substantive components. Procedurally, the state must comply with the stated requirements of the IDEA. *Id.* at 206–07, 102 S.Ct. 3034. Substantively, the state must offer the child a FAPE, which requires a targeted educational program setting reasonably calculated goals

[19] Because the court concludes that AACPS did not deny J.K. a FAPE for the 2024-2025 school year, it does not reach the questions of whether Harbour is an appropriate placement or L.K. is entitled to reimbursement for same.

> for a child's progress in light of the child's particular circumstances.
> *Endrew F.*, 137 S.Ct. at 999.

*R.F. by & through E.F. v. Cecil Cnty. Pub. Schs.*, 919 F.3d 237, 245 (4th Cir. 2019). "Not all procedural violations of the IDEA result in the denial of a FAPE," *see id.* at 248, and "[t]he fact of a procedural IDEA violation does not necessarily entitle [Plaintiffs] to relief." *T.B., Jr. by & through T.B., Sr. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018). Instead, "the procedural violation must have caused substantive harm." *Id.* Stated differently, the court must determine that the procedural violation resulted in a denial of a FAPE for J.K.[20] *See id.*; *R.F.*, 919 F.3d at 248 ("Unless an ALJ determines that a given procedural violation denied the child a FAPE, she may only order compliance with the IDEA's procedural requirements and cannot grant other forms of relief, such as private placement or compensatory education."); *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 533 (4th Cir. 2002) ("When such a procedural defect exists, we are obliged to assess whether it resulted in the loss of an educational opportunity for the disabled child, or whether, on the other hand, it was a mere technical contravention of the IDEA.").

The IDEA implementing regulations provide: "In determining the educational placement of a child with a disability, including a preschool child with a disability, each public agency must ensure that," *inter alia*, the placement decision "[i]s made by a group of persons, including the parents, and other persons knowledgeable about the child, the meaning of the evaluation data, and the placement options," and "[i]s based on the child's IEP." 34 C.F.R. § 300.116(a)(1), (b)(2). Accordingly, a school district "may not predetermine a student's placement before creating their

[20] While acknowledging this caselaw, Plaintiffs seemingly ask this court to reject the above-referenced Fourth Circuit precedent because it "seems to conflict with the letter of the law and the spirit of the IDEA." (ECF No. 27 at p. 4.) As counsel is well-aware, this court is not free to disregard binding Fourth Circuit precedent. In any event, because the court finds that the record does not support that AACPS predetermined J.K.'s IEP in advance of the May 2024 meetings, Plaintiffs' argument fails regardless.

IEP." *A.B. v. McKnight*, No. 22-3295-BAH, 2025 WL 90648, at *10 (D. Md. Jan. 14, 2025) (citing *Spielberg by Spielberg v. Henrico Cnty. Pub. Schs.*, 853 F.2d 256, 259 (4th Cir. 1988)). "[I]f the school system has already fully made up its mind before the parents ever get involved, it has denied them the opportunity for any meaningful input." *Hanson*, 212 F. Supp. 2d at 486; *see H.R.B. v. St. Mary's Cnty. Bd. of Educ.*, No. CV TJS-24-762, 2025 WL 1556067, at *10 (D. Md. May 30, 2025) (same); *A.B. v. McKnight*, No. 22-3295-BAH, 2025 WL 90648, at *10 (D. Md. Jan. 14, 2025) (same).

While the school district must come to the IEP team meeting with an "open" mind, it need not be a "blank" mind. *Doyle v. Arlington Cnty. Sch. Bd.*, 806 F. Supp. 1253, 1262 (E.D. Va. 1992), *aff'd,* 39 F.3d 1176 (4th Cir. 1994); *see H.R.B.*, 2025 WL 1556067, at *10 (same); *A.B.*, 2025 WL 90648, at *10 (same); *Hanson*, 212 F. Supp. 2d at 486 (same). As this court has recently remarked, "predetermination is not synonymous with preparation, . . . [t]hus, while a school system must not finalize its placement decision before an IEP meeting, it can, and should, have given some thought to that placement." *A.B.*, 2025 WL 90648, at *10 (first quoting *Nack ex rel. Nack v. Orange City Sch. Dist.*, 454 F.3d 604, 610 (6th Cir. 2006); and then quoting *Doyle*, 806 F. Supp. at 1262). Such preparation is particularly relevant in Maryland, as the applicable statute requires that "at least 5 business days before a scheduled meeting of the individualized education program team or other multidisciplinary education team for any purpose for a child with a disability, appropriate school personnel shall provide the parents of the child with," relevant here, "[a]n accessible copy of each assessment, report, data chart, draft individualized education program, or other document that either team plans to discuss at the meeting." MD. CODE ANN., EDUC. § 8-405(e)(1)(i)(1).

Assuming without deciding that Plaintiffs' procedural violation claim is properly before this court,[21] the court concludes that Plaintiffs have not met their burden to demonstrate that AACPS violated the IDEA by predetermining J.K.'s placement prior to the completion of his May 17, 2024 IEP.

Plaintiffs offer legal argument regarding predetermination and its offense to parental involvement under the IDEA, but the court's concern is with the actual record upon which they base a claim of predetermination. Plaintiffs offer in full:

> Mr. McCoy explained at hearing that prior to the May IEP meetings, he met with J.K.'s entire team at Harbour to discuss IEP development. Tr. at 788-9. He described that there were specific conversations about J.K.'s placement, including a Harbour representative sharing that she believed J.K. would be fine either at Harbour or in the proposed AACPS placement in the ACC program. Tr. at 789-790. Ms. Hammett further addressed these conversations about placement during the "pre-planning meeting." Tr. at 1038.
>
> Notably, after whatever was discussed at the "pre-planning meeting," Harbour staff did not share an opinion about J.K.'s IEP services and placement during the May IEP meetings. Tr. at 791. Nor was anything about the conversation during the "pre-planning meeting" shared in writing in his file. Therefore, the first time the parent even learned of these conversations was during the hearing, and after resting her evidentiary case. Tr. at 847, 1093.

(ECF No. 25-1 at p. 17.)

[21] While Plaintiffs challenge the ALJ's statements regarding what they ought to have done vis-à-vis the alleged procedural violation, the fact remains that the ALJ determined that the procedural violation was not properly before him. Plaintiffs offer no argument to this court to support its authority to consider the alleged procedural violation that they have not exhausted. *Cf. D.C. by Chaplick v. Fairfax Cnty. Sch. Bd.*, 171 F.4th 255, 262 (4th Cir. 2026), *cert. denied sub nom. D. C. v. Fairfax Cnty. Sch. Bd.*, No. 26-215, 2026 WL 2976890 (U.S. Oct. 5, 2026) ("The IDEA's exhaustion requirement applies to every claim in Plaintiffs' complaint.") Nonetheless, in view of the legal authority cited by Plaintiffs before the ALJ—*see S.M. ex rel. D.M. v. McKnight*, No. CV DLB-23-1387, 2024 WL 4349740, at *19 (D. Md. Sept. 30, 2024) ("The Court has not located (and MCPS has not cited) any binding authority that requires parents to administratively exhaust every issue. The Court need not decide whether there is an issue exhaustion requirement in IDEA cases. Regardless of whether the claim was exhausted, it has no merit.")—and where the ALJ detailed what his findings and conclusions would have been had the procedural violation been properly before him, the court will consider same. The court also notes that Defendants raise no objection to the court's consideration of the alleged procedural violation.

The claim of predetermination rests on a pre-planning meeting at which a Harbour staff member commented that J.K. would be fine at either Harbour or the Arundel ACC program. This does not support that AACPS predetermined J.K.'s placement. To begin, as a practical matter, the statement at issue notes that J.K. would be fine at either program; this does not support that AACPS predetermined J.K.'s placement as the Arundel ACC program prior to the May 2024 IEP meetings. Instead, such a conversation is, as the ALJ noted, entirely consistent with AACPS ensuring it comes to the IEP meeting prepared, especially where the Settlement Agreement specifically required that Arundel ACC would be J.K.'s stay put school.

As the ALJ found:

> In preparation for IEP meetings, the AACPS conducts internal pre-planning meetings with Harbour's staff to review the data and information collected for all its students' upcoming IEP meetings. Before the pre-planning meetings, Harbour staff draft data in electronic format. During the pre-planning meetings AACPS staff and Harbour staff discuss the data and copy appropriate information into a draft IEP using IEP forms in preparation for upcoming IEP meetings. Parents are not invited to these meetings.
>
> As a general best practice, the AACPS has these meetings for all of its students placed at Harbour, and a draft IEP is created at the end of a pre-planning meeting.
>
> After the pre-planning meeting the draft IEP is sent to parents in advance of the upcoming IEP meeting, so that the parents can review the draft IEP and discuss it with the IEP team at the IEP meeting.

(AHD ¶¶ 119–121.) The testimony regarding a comment about J.K. being able to fit in either of the placements at issue does not, against this backdrop, support a finding that AACPS did not come to the IEP meeting with an open mind.

That AACPS's proposal was consistent with the previous year similarly does not support a conclusion that AACPS lacked an open mind based on the record before the ALJ, as well as his factual and credibility determinations. AACPS accepted the materials provided by L.K., and L.K.

presented her position with her own voice and through counsel. AACPS explained its reasoning with regard to the recommendations and the May 17, 2024 IEP, which the ALJ found credible. Based on that record, this is not a situation where AACPS selected the placement and "then developed an IEP to carry out [the] decision." *Spielberg*, 853 F.2d at 259. Indeed, Plaintiffs' logic would have the court find a procedural violation any time there is a dispute on placement and the school district recommends the student's stay put placement. In view of the foregoing, Plaintiffs have not met their burden to show a procedural violation of the IDEA based on predetermination.

Importantly, even had Plaintiffs successfully shown a procedural violation, the court would nonetheless find they are not entitled to the relief that they seek—private placement or compensation—because any such procedural violation did not deny J.K. a FAPE for the reasons detailed at length above. *See R.F.*, 919 F.3d at 248, *supra*.

## IV. CONCLUSION

For the reasons set forth herein, by separate order, Plaintiffs' Motion will be denied, and Defendants' Motion will be granted.

October 29, 2026

/S/

______________________________
Julie R. Rubin
United States District Judge